CHEHARDY, Judge.
Annette LaSalle filed suit against Bryan Kubelka and his insurer, Ambassador Insurance Company, for injuries suffered in an automobile accident on June 18, 1982. She subsequently added as a defendant her own uninsured/underinsured motorist insurer, Safeco Insurance Company. From a judgment in favor of the plaintiff, Safeco has appealed.
LaSalle was the passenger in a leased car operated by William H. Belcher, III, driving eastbound on the Interstate 10 highway in St. Charles Parish between Laplace and Kenner. Belcher’s car was traveling at 50-55 miles per hour in the left lane when Belcher noticed a disabled vehicle stalled on the left shoulder of the road, partially blocking the left lane. Belcher could not change lanes due to traffic in the middle lane, so he applied his brakes. He was slowing to a stop when his car was struck forcibly from the rear by Kubelka’s car, which was following him.
An answer was filed on behalf of Kubel-ka and Ambassador, asserting the defenses of sudden emergency and third-party negligence. In addition, these defendants also filed a third-party demand against Belcher and his automobile liability insurer (later determined to be Aetna).
The plaintiff later filed a supplemental and amending petition adding as a defendant her own uninsured/underinsured motorist insurer, Safeco Insurance Company. *525 Safeco answered and also filed a third-party demand against Belcher, which was never served on him.
The case was tried without a jury on April 6, 1988. The parties stipulated that the amount of the medical bills was $2,110; that Aetna Surety had paid the plaintiff $10,000 pursuant to the uninsured motorist coverage of its policy; that the applicable liability limit of Kubelka’s policy with Ambassador was $5,000; and that Ambassador Insurance Company entered rehabilitation on November 10, 1983, and was ordered liquidated by the Commissioner of Insurance in December 1986.
Judgment was rendered on July 29,1988, finding Kubelka and Safeco liable to the plaintiff in the amount of $55,420, subject to a credit of $10,000 for the Aetna payment already received by the plaintiff. In reasons for judgment incorporated in the judgment itself, the trial judge found that Kubelka’s negligent driving was the sole and proximate cause of the accident and that Belcher was free of negligence. He awarded the plaintiff general damages of $50,000 and special damages of $5,420 (comprising $3,000 for lost wages and $2,420 for medical bills).
On appeal Safeco assigns as error the following: (1) the trial court’s failure to assess some degree of negligence against Belcher and the disabled vehicle; (2) the trial court’s failure to consider other available insurance, specifically Ambassador’s, as well as other primary liability insurance policies allegedly covering the plaintiff; (3) and the trial court’s abuse of discretion by awarding excessive damages and neglecting to find plaintiff failed to mitigate her damages.
We find no merit to the claim that the trial court should have assessed some degree of negligence against Belcher and the disabled vehicle. Belcher testified he had been driving in the left lane of the highway for 20 minutes before he saw the disabled vehicle up ahead and began applying his brakes. He admitted he had to step on the brakes forcefully in order to stop in time. Nonetheless, even after his car was struck by Kubelka’s, it did not collide with the disabled vehicle.
Kubelka, on the other hand, testified that Belcher had changed into the left lane immediately before putting on his brakes; that he, Kubelka, had been following Belch-er’s car on the highway; and that he had changed lanes when Belcher changed lanes, but did not see the disabled vehicle and was unable to stop when Belcher suddenly applied his brakes. Safeco argues this was a sudden emergency, absolving Kubelka from any finding of negligence.
We do not agree. “The first duty of those who operate engines or motor vehicles is to keep a sharp lookout ahead to discover the presence of those who might be in danger.” Ferrer v. Gilbert, 436 So.2d 687, 689 (La.App. 4 Cir.1983).
The appellant cites the Ferrer case to support its allegation that Belcher was negligent, but the principle is equally applicable to Kubelka. Under the circumstances, the fact that the disabled vehicle partially blocked the lane of traffic was not the cause of the accident, nor was Belcher’s changing lanes (if we were to believe Ku-belka’s version). Belcher was able to stop in time; Kubelka was not. A priori, Ku-belka was following too close. The trial court correctly concluded Kubelka’s negligence was the sole proximate cause of the collision.
Safeco’s argument regarding applicability of other insurances is predicated partly on the alleged negligence of Belcher. That is, if he were held to be partially at fault, his liability insurance would be called to respond in judgment and Safeco, as La-Salle’s U/M carrier, would be responsible only for damages in excess of such other payments. This portion of the argument is moot, however, because we affirm the trial court’s exculpation of Belcher.
Safeco’s other argument concerning coverage by other insurance has merit, however. Kubelka’s insurer, Ambassador, was not cast in judgment because at the time of trial Ambassador was undergoing liquidation. The court failed, however, to credit the amount of Ambassador’s liability limits ($5,000) against the amounts due by *526 the U/M insurers. Safeco contends this was error, citing the following provisions of the statute on uninsured motorist coverage:
“For the purpose of this coverage, the terms ‘uninsured motor vehicle’ shall, subject to the terms and conditions of such coverage, be deemed to include an insured motor vehicle where the liability insurer thereof is unable to make payment with respect to the legal liability of its insured within the limits specified therein because of insolvency.”
LSA-R.S. 22:1406(D)(2)(a).
“An insurer’s insolvency protection shall be applicable only to accidents occurring during a policy period in which its insured’s uninsured motorist coverage is in effect where the liability insurer of the tort feasor becomes insolvent within one year after such an accident. * * * ”
LSA-R.S. 22:1406(D)(3).
The parties stipulated that Ambassador Insurance Company’s entrance into receivership and subsequent declaration of insolvency both occurred more than one year after the accident made the basis of the suit. Under R.S. 22:1406(D)(3), therefore, Ambassador cannot be considered insolvent for purposes of applying its coverage herein. See Alleman v. Employers Liability Assur. Corp., 253 So.2d 688 (La.App. 3 Cir.1971). Accordingly, the trial court erred in failing to credit the amount of Ambassador’s policy limits against the amount due under the judgment. We shall revise the judgment to reflect the credit.
The final issue is Safeco’s contention that the general damages award and the award for lost earnings are excessive.
LaSalle testified that, immediately after the collision, which occurred at approximately 6:30 p.m., she was very dazed and stunned and had problems seeing. She did not seek medical treatment until 11 a.m. the next day, when she was seen in the emergency room of a Baton Rouge hospital. She was examined and x-rayed by the physician on duty, whose diagnosis was “post-contussive syndrome and low back strain.”
Six days later she saw her personal physician, Dr. Robert St. Amant, who diagnosed a “mild suggestion of muscle tension in the lower lumbar area.” He prescribed an analgesic medication and a muscle relaxant and advised her to see an ophthalmologist for her complaints of blurry vision. He found no objective symptoms relating to her vision problem.
On July 6, 1982, some three weeks after the accident, plaintiff consulted Dr. Cray-ton Farguson, her ophthalmologist. Dr. Farguson found no objective signs of injury to the eye. He testified temporary blurred vision is commonly associated with head injuries. He made no recommendation to her at the time.
She did not return to him until October 5, 1982, when she was seen for complaints of occasional flashing lights in both eyes and a “floater” in the left eye, with bouts of dizziness. He stated these are symptoms of vertigo. He noted she told him she had been slapped on the face by an acquaintance the preceding weekend. He did not feel her complaints related to this assault, however, because she had made the appointment to see him prior to that incident. He recommended she undergo evaluation by a neurologist and an otolaryngologist (ear-nose-and-throat doctor) to see if she had any inner ear problem to explain her symptoms.
Her next visit to his office was more than two years later (April 1986), when she was seen by his associate for complaints of eye infection. Apparently she also complained of occasional blurry vision. Dr. Farguson had no information as to whether she had seen the specialists as he had recommended.
His last note on her was from August 1986, when she had telephoned to request a prescription for eyedrops. In conclusion, he testified he found no permanent visual impairment in her and he stated that most vertigo difficulties are related to inner ear problems.
Dr. David Aiken, Sr., a general surgeon who now practices occupational medicine, testified he first examined the plaintiff on October 14,1982, at the behest of her attor *527 ney. Dr. Aiken had experience in dealing with vertigo problems as a former flight surgeon in the Air Force.
He stated he found she had a mild impairment of vision, not related to her complaints, and wore contact lenses. She complained of intermittent blurred vision and impairment of her peripheral vision and said she saw flashing colors. She stated she had headaches about once a week and that she had spinning feelings when crossing bridges and occasional ringing in her ears (tinnitus).
He said that, except for her slight visual impairment, the only abnormality he found was some tenderness in the low back region in an area two to three inches long along the midline. There was no muscle spasm. He found her symptoms compatible with trauma from an automobile accident. He stated a sharp blow to the back of the head, such as one would sustain with a whiplash injury, can injure the visual cortex of the brain.
Dr. Aiken next saw her on March 4, 1983, at which time she felt her vision had cleared and her neck was not hurting, but she still had some low back discomfort. She still complained of vertigo, especially when driving on a bridge. He recommended she see an ENT (ear-nose-throat) doctor and that she return for a follow-up examination in three months.
LaSalle did not return to Dr. Aiken for three years, however. He next saw her on March 23, 1986. She still complained of vertigo and occasional tinnitus. She had no neck and back problems. He recommended she undergo tests for the vertigo and referred her to Dr. Wallace Rubin. Dr. Aiken stated he has not seen the plaintiff since that time.
Dr. Rubin is a board-certified otolaryn-gologist with subspecialties in immunology and neurootology (the study of diseases and treatment of the inner ear for hearing and balance). He testified he saw the plaintiff three times between May 15 and August 19 of 1986. On May 15, at her first visit, she complained of difficulty in driving and of dizziness at heights for the preceding four years, especially in elevators and on the upper stories of buildings. She told him the problems had begun with a concussive head injury in a car accident in 1982 when her head struck the windshield. She related to him that she had some vision difficulties for about one week post-accident and that she had experienced lethargy, sleepiness, and difficulty putting things together in her thinking process for about three months after the accident. She told him these problems had resolved and the only problem left was the dizziness “primarily and solely with moving vehicles and at heights.”
His physical examination, ENT exam, and gross neurologic testing gave normal results. However, other neurological tests he administered — an electronystagmogram, a simultaneous binaural bithermal test, and a balance test using a computerized rotating chair — revealed abnormal results, indicating difficulty on the right side of her balance system. He stated this agreed with the history she had given him. Accordingly, he recommended she return later for more extensive objective testing.
On June 24, 1986, she returned to undergo tests of her blood chemistry, an MRI (magnetic resonance imaging) test, and an internal auditory meatus scan. These ruled out a structural problem such as a tumor or multiple sclerosis.
His diagnosis was that she had right labyrinthine disease — that is, her right inner ear was responsible for her balance problem. In his opinion, this was caused by the whiplash-type injury she suffered in the 1982 auto accident.
He last saw the plaintiff on August 19, 1986, when he informed her of the results of the testing. At that time he recommended she make certain dietary adjustments to regulate her blood chemistry and that she perform certain exercises designed to train the brain to recycle or reprogram itself to adjust to the imbalance problem.
Dr. Rubin testified he was unable to give a prognosis for LaSalle because she had never returned to see him and therefore he did not know whether she had followed his recommendations.
*528 Dr. Rubin described three categories of prognosis for head-injury balance problems. If improvement begins within the first year there is a 95% chance the person can completely recover. If the problem goes into years one to three, then the chance for recovery drops to 50-60%. If a person has this kind of problem for more than three years, there is only a 25-30% chance for a complete recovery. Because the plaintiff first saw him four years after the problems began, she was already in the lowest statistical range for cure.
Dr. Rubin stated that LaSalle’s limitations would be at heights and in moving vehicles, especially when she is a passenger in the vehicle. He said she evidently was doing well. He also stated he would not place restrictions on her activities; he felt the more moving around, the better for her problem. He would make an exception if her occupation involved working at heights, such as an ironworker on a tall building would do, or if she were an industrial diver, or had a hazardous occupation, such as operating heavy machinery.
He noted that one reason she may not have experienced the vertigo until several months after the accident was that, as she told him, she was lethargic and stayed in bed for two or three months afterward.
LaSalle testified, as noted above, she was stunned and dazed following the accident and had blurred vision. She stated she is an attorney and was scheduled to start a new job at a legal clinic the day after the accident. Because of her injury she stayed at home, mostly in bed, for two months because she was too dazed to think of going to a doctor. She testified she would have been paid a salary of $1,500 per month during this time had she worked at the legal clinic as planned. (The $3,000 lost earnings awarded by the trial court was for the two months the plaintiff stayed away from the legal clinic job.)
When she did return to work, apparently it was not for the legal clinic but was, instead, in a solo law practice. (The record is not clear on this point.) She testified that the vertigo had interfered with her earning capacity, in that her inability to drive across bridges prevents her from accepting cases that will require her to cross the river. She estimated she turns down four or five cases a year for this reason. (In contrast, her secretary could recall her refusing only four or five cases over the five-odd years between her return to work and the date of trial.)
LaSalle also testified the vertigo interferes with her social life in that she is unable to drive across bridges to visit family and friends, requiring her to rely on friends to drive her. In addition, she stated, she is an ardent mountain-climber and hiker; although she still engages in these activities, she is limited in the heights to which she can climb. She is able to scuba-dive, however, and vacationed in the Fiji Islands. She stated that flying in an airplane does not affect her as long as she does not look out the window.
The appellant argues that the award of $50,000 for general damages is excessive because the plaintiff clearly failed to mitigate her damages, in that she did not actively pursue appropriate medical treatment for her vertigo after Dr. Farguson’s recommendation. In addition, she failed to follow Dr. Aiken’s advice that she see a neurologist or ENT doctor. By the time she was tested by Dr. Rubin and her problem clearly diagnosed, four years had passed, reducing her chance of recovery. The appellant argues the vertigo cannot interfere with her life as much as she claims if she was able to ignore it to that extent.
Reviewing the evidence, we conclude that the award of $50,000 certainly must be considered high for the injuries suffered. We cannot say, however, that it is so high as to “shock the conscience of the court” or to be considered an abuse of the trial court’s discretion. Although the plaintiff’s behavior does appear to be a failure to mitigate her damages, the testimony does not plainly establish that earlier medical treatment would have resolved the plaintiff’s vertigo. Dr. Rubin, despite his discussion of the three statistical categories for balance injury recovery, was unable to say with any certainly that this plaintiff *529 would have been able to overcome the labyrinthine disease had she sought appropriate medical treatment sooner.
We agree, however, with the appellant’s claim that plaintiff should not have been awarded damages for two months’ loss of earnings. Under the circumstances, a two-months’ absence from work without benefit of medical advice was not justified. The most we feel plaintiff can reasonably recover is two weeks’ wages, $750.
For the foregoing reasons, the judgment of the district court is revised to reflect that Safeco Insurance Company, as uninsured motorists insurer of the plaintiff, is liable only for amounts of the judgment exceeding the first $15,000 ($5,000 reflecting the policy limits of Ambassador Insurance Company and $10,000 the policy limits of Aetna Insurance Company) up to the amount of Safeco’s uninsured motorist policy limits. The judgment is further revised to reduce the award for loss of earnings from $3,000 to $750, making the total damages awarded $53,170. As revised, the judgment is affirmed. Costs of the appeal are assessed equally against the appellant and the plaintiff.
REVISED AND, AS REVISED, AFFIRMED.